1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
2
   ANTONIO SANCHEZ OCHOA,              )
3                                      )
                       Plaintiff,      )  Case No. 1:17-CV-03124-SMJ
4                                      )
   vs.                                 )  July 25, 2017
5                                      )  Spokane, Washington
   ED W. CAMPBELL, Director of         )
6  Yakima County Department of         )  Motion Hearing
   Corrections; SCOTT HIMES, Chief     )
7  of the Yakima County Department     )  Pages 1 - 64
   of Corrections; and YAKIMA          )
8  COUNTY,                             )
                                       )
9  _____Defendants. )

10         BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
               UNITED STATES DISTRICT COURT JUDGE
11
   APPEARANCES:
12
   For the Plaintiff:          Mr. Matthew H. Adams
13                             Attorney at Law
                               615 Second Avenue, Suite 400
14                             Seattle, Washington 98104

15                             Ms. Lori Jordan Isley
                               Mr. Bernardo R. Cruz
16                             Attorneys at Law
                               6 South Second Street, Suite 600
17                             Yakima, Washington 98901

18 For the Defendants:         Mr. Quinn N. Plant
                               Attorney at Law
19                             807 North 39th Avenue
                               Yakima, Washington 98902
20
   For Interested Party:       Mr. Erez Reuveni
21                             U.S. Attorney's Office
                               450 5th Street NW
22                             Washington, DC 20530

23                             Mr. Timothy M. Durkin
                               U.S. Attorney's Office
24                             920 West Riverside, Suite 300
                               P.O. Box 1494
25                             Spokane, Washington 99210-1494

1   / / / / /

10  / / / / /

20  Official Court Reporter:        Ronelle F. Corbey, RPR, CRR, CCR
                                    United States District Courthouse
21                                  P.O. Box 700
                                    Spokane, Washington 99210
22                                   (509) 458-5283

    Proceedings reported by mechanical stenography; transcript
25  produced by computer-aided transcription.

1   (Court convened on July 25, 2017, at 2:34 p.m.)

2           THE COURTROOM DEPUTY:  Court has reconvened.

3           THE COURT:  Please be seated.

4           THE COURTROOM DEPUTY:  The matter before the Court is

5   *Sanchez Ochoa v. Campbell, et al.*, Cause No. CV-17-3124-SMJ,

6   time set for motion hearing.

7       Starting with the plaintiff, please state your presence for

8   the record.

9           MR. ADAMS:  Matt Adams with Northwest Immigrant Rights

10  Project on behalf of the plaintiff.

11          MS. ISLEY:  Lori Isley, Columbia Legal Services, for

12  the plaintiffs.

13          MR. CRUZ:  Bernardo Cruz on behalf of the plaintiff

14  with Columbia Legal Services.

15          THE COURT:  Good afternoon to all three of you.

16          MR. PLANT:  Quinn Plant representing Yakima County,

17  your Honor.

18          MR. REUVENI:  Good afternoon, your Honor.

19  Erez Reuveni on behalf of the United States.

20          MR. DURKIN:  Tim Durkin, your Honor, on behalf of the

21  United States.

22          THE COURT:  Good -- good afternoon to all parties

23  today.

24      Counsel, as I see it, there's a motion for a temporary

25  restraining order that's been filed by the plaintiffs in this

1  case asking for this extraordinary relief.  And, so, I see, as

2  the threshold issue, the decision, really, on the success of the

3  merits problem with the *Winter* test.

4       So, going to the issue of whether or not there was a Fourth

5  Amendment right that was violated, that there was a seizure,

6  based upon the pleadings, the defendants contest that -- contest

7  that there was a seizure, that there is no hold.

8       And, so, I want to hear from both sides on this point.

9  We're going to go through the others.  I want to make sure I

10 understand the different arguments, but let's start here.  So,

11 I'm not sure who's handling that portion or the argument from

12 the plaintiff's side; and, then, I'll hear from the defense

13 along with the Government, if they wish to address that point,

14 as well.  Okay?

15           MR. ADAMS:  Thank you.

16           THE COURT:  So the question I have, if there is a --

17 if it is as the Government -- excuse me -- the County has

18 indicated, if, in fact, Mr. Sanchez Ochoa is free to post bail

19 and they, in fact, do post bail and, in fact, are released from

20 Yakima County Jail, you would agree, then, that -- even if, for

21 example, ICE then detains him after that, you'd agree that

22 there's no Fourth Amendment issue, is there?

23           MR. ADAMS:  We would agree that ICE has the

24 prerogative to detain him when he is released; and we would

25 agree that had the County not interfered with his opportunities

1  to post bail, then -- and he's now able to post bail -- then

2  there would be no Fourth Amendment issue.

3          THE COURT:  Can you point to what you believe are

4  facts in the record that the Court can rely upon to indicate

5  that, in fact, this was a detention?

6          MR. ADAMS:  Certainly.  And I would like to point to

7  two -- actually, three separate points that indicate that it's a

8  detention.  And the first point, while perhaps not as -- I would

9  say the first point defendants have not even addressed in their

10 opposition and that is the fact that we've submitted, not just

11 in the Complaint itself, allegations but supporting Declarations

12 asserting that Mr. Sanchez is unable to obtain a bond and -- and

13 work with a bail bond agency because of the immigration hold

14 that's been lodged against him.

15     And, so, we have not just his allegation in the Complaint,

16 but we have the Declaration of -- of his sister who tried to

17 post the bond.  We have the Declaration of one bail bonds

18 agency.

19     And, as we pointed out in our reply, we have the Ninth

20 Circuit's case, which is controlling in this matter, in *Mendia*

21 *v. Garcia*, which said specifically that a -- in that case, it

22 was -- a federal official can be held liable even if that

23 federal official is not detaining the individual but their

24 action interferes with the bail bond agency's willingness -- or

25 willingness to -- to work with or to contract with the detained

1  individual.

2      And, as I mentioned, the defendants don't contest this,

3  although they do submit a Declaration saying they understand

4  it's difficult but that has nothing to do with them.  But it has

5  everything in the world to do with them.  It is their action in

6  placing that immigration hold that caused the bail bond agencies

7  to refuse to engage in services with our client.

8          THE COURT:  That case -- that's the -- is that the

9  Judge Watford's case?

10         MR. ADAMS:  That's correct.  Yes.  Thank you.

11         THE COURT:  Okay.

12         MR. ADAMS:  The second point -- and I realize there's

13  a disputed fact here -- is the understanding that -- and the

14  allegation that the County has advised our plaintiff, both

15  through that letter to his attorneys and through their practice,

16  that they will not even accept a bail being posted.  And we have

17  pointed to the County's letter, which is Docket 7-2, which

18  acknowledges this hold.  They don't say in that letter, "Oh,

19  there is no hold."  They say, "There's an ICE hold, but this

20  individual's going to have to work that out with ICE.  He can't

21  post that through us."  So --

22         THE COURT:  Are they referring to a potential bond

23  that ICE may -- that -- that the immigration court is --

24  is imposing?  Isn't that what they're saying in that letter?

25         MR. ADAMS:  That's certainly how they attempt to

1  portray that now; but, I think, if it's looked at in context,

2  especially with the initial letter that we sent to defendants,

3  it's hard to read it in that light.

4         THE COURT:  Okay.  Clarify that.

5         MR. ADAMS:  So, in our initial letter that we directed

6  to the defendants, we asked them to refrain from instituting

7  immigration holds against individuals because the I-200, the

8  administrative form, doesn't provide legal authority for that

9  hold.  And, then, we also stated:  And this interferes with our

10  plaintiff's ability because he's not even able to post a bail.

11      And their response was not that he could post a bail and

12  deal with immigration officials afterwards.  They're saying,

13  "Well, he can post bail; but he's got to work that out with the

14  feds."  And I think the message that we read is loud and clear

15  with the practice that is experienced there in the community of

16  -- individuals simply are -- are turned away from it.

17      But -- but even if the Court were not to agree that that's

18  so clear and that, in fact, as defendants now assert that an

19  individual detainee with an immigration hold notation is -- is

20  able to post bail, the last and fundamental point is that they

21  will not be afforded -- our client will not an afforded the

22  opportunity to be released by posting that bail.  And that is

23  not because the Department of Homeland Security might show up at

24  the doors of the jail and take him back into custody; but,

25  instead, because the County, themselves, takes it upon

1  themselves, based on this I-200 that has been shared with them,

2  to redesignate the individual as being under ICE custody.

3      It's very notable in their brief.  The County never states

4  that our client will be physically released.  They state he'll

5  be released from ICE -- excuse me -- from Yakima County custody,

6  at which point they automatically, as an administrative matter,

7  redesignate him, unilaterally taking their own action as a

8  federal detainee.

9          THE COURT:  What is wrong with that?

10         MR. ADAMS:  Because they have no authority to take

11 that action.  And -- and I think, again, it's pointed that, in

12 defendant's brief, they do not even attempt to assert that the

13 I-200 provides them with authority to take an administrative

14 action to -- to transfer someone to different custody.

15         THE COURT:  Well -- but they've served the

16 defendant -- excuse me -- the plaintiff in this case.  They've

17 served him with that administrative warrant.  Right?

18         MR. ADAMS:  I'm -- I am unclear whether they or the

19 ICE officer provided him with a copy of it.

20         THE COURT:  I'm sorry.

21         MR. ADAMS:  But, yes.

22         THE COURT:  I wasn't clear.  It's my understanding

23 from the review of the pleadings and the documents that, in

24 fact, it was the ICE officer or a federal agent who, in fact,

25 served Mr. Sanchez Ochoa with that document, with that warrant.

1     So, even though Mr. Sanchez Ochoa has been served, what's

2   the problem with them, then, just clicking a button and saying,

3   "Now he's in federal custody"?

4          MR. ADAMS:  Because Yakima County does not have the

5   authority to click that button, to enforce that administrative

6   warrant.  We do not dispute that an ICE officer without warrant

7   in hand or, you know, without warrant having been served can

8   pick him up.  And, if ICE so chooses, they can meet him at

9   that -- the gate of the jail as he's being released and turn him

10  right back around.  And, being in federal custody, they would

11  have the authority, then, to use their intergovernmental

12  agreement where they rent out bed space and place him back into

13  Yakima custody.

14     But this warrant is pointedly directed -- and, again, this

15  is at Docket 7-1 -- is pointedly directed just to immigration

16  officers.  Any immigration officer authorized, pursuant to the

17  sections it says, as commanded.  And, if you dig deeper, it

18  doesn't get any better, because that's based on the regulations

19  at 236.1 and at 287.5(e), where both explicitly lay out the list

20  of individuals who are authorized to execute the arrest warrant;

21  and that's limited to those federal officials.

22          THE COURT:  What specific injury are you saying is

23  occurring at the -- I mean, between meeting him at the jail door

24  with the ICE agent, Homeland Security individual -- meeting him

25  at the jailhouse door with that warrant?  What's the difference

1  between that and what they're doing now?

2       MR. ADAMS:  There's two injuries that I would point

3  to, and the first is that it's -- it is speculative whether ICE

4  will take custody.  They often do, but they don't always.  And,

5  so, we can't simply assume that he's not going to face any

6  additional custody just because another authority agency

7  jurisdiction might take custody of him.  What we have to look at

8  is whether Yakima County has the authority to continue to extend

9  his detention.

10      And the second point -- and I would say this with our

11  client specifically and other clients that we work with on a

12  daily basis -- even if eventually ICE does take custody of him,

13  at least at that point he will have the right to demand a bond

14  hearing in front of an immigration judge.  And we'll be able to

15  go in front of that immigration judge and get a bond form so

16  that he can be released to his eight-year-old child and back

17  with his family.

18      As it stands, he's prevented from being released under --

19  on the bail.  And even if, in worst-case scenario -- which ICE

20  has, we admit, the prerogative to show up and arrest him whether

21  it's at the jail or at his home --

22          THE COURT:  Right.

23          MR. ADAMS:  -- if they do take him back into custody,

24  at that point, he has the right under Section -- it's 236 of the

25  Immigration Nationality Act -- to demand a bond hearing in front

1  of an immigration judge if ICE officials decide to take him into

2  custody.

3       So he faces harm at both points.  And, of course, this is

4  already going beyond the first point we mentioned; that he

5  doesn't even have the opportunity to post bail because the bail

6  bond agency won't work with him.

7            THE COURT:  Okay.  Okay.  Anything else on this point?

8            MR. ADAMS:  The -- I would -- I would just like to

9  emphasize that, while the County now, in their briefing, resists

10  the term "immigration hold," that is the term that's taken

11  straight from their jail register.  That's the term that they

12  used.  Well, they didn't say, "immigration."  They said, "ICE

13  hold" but in responding to our letter.  And that's the term that

14  they used in prior correspondence that we've included in support

15  of our reply.  So, they might try to give it a different label;

16  but, at the end of the day, they don't deny that he will not --

17  that the -- that the purpose of this, whether it's a hold or a

18  notation in the system, is to ensure that he'll be transferred

19  to the custody of Department of Homeland Security.

20       And then they go one step further.  Well, actually, I would

21  say that the U.S.A. goes one step further in their briefing and

22  says, "And we have this intergovernmental agreement," which they

23  can hold people.  And -- and we do not deny that that

24  intergovernmental agreement allows the Federal Government to

25  rent bed space from the County.

1    But what it pointedly does not do is authorize county

2   officials to arrest someone, to extend an arrest, or to transfer

3   someone; to take that unilateral action.  It only talks about

4   federal detainees.  And we have not got to the point in these

5   proceedings where the federal authorities have taken custody of

6   our client.  Our client is in the custody of Yakima County, and

7   it's Yakima County's actions that have impaired his ability to

8   post bail.

9           THE COURT:  Okay.  Thank you.

10          MR. ADAMS:  Thank you.

11          THE COURT:  Now, is it Mr. Harper?  No.

12          MR. PLANT:  Plant.

13          THE COURT:  Plant.  Mr. Plant, would you come forward,

14  please.  So, on this point, if you could tell the Court, point

15  to the record where it establishes that, in fact, this is not a

16  seizure under Fourth Amendment analysis.

17          MR. PLANT:  Certainly, your Honor.  The Declaration

18  provided of Chief Himes explains that the -- Mr. Sanchez was

19  arrested and is being detained in Yakima County in accordance

20  with a probable cause finding by a Yakima County Superior Court

21  judge.

22      With respect to an immigration hold (indicating) or the

23  administrative warrant that has been issued --

24          THE COURT:  Now, Counsel, for the record, you used

25  your fingers to put "immigration hold" in quotation marks.  That

1  is, in fact, what is in the Yakima County system.  Correct?

2        MR. PLANT:  That is their notation on the website.

3  Yes, your Honor.

4        THE COURT:  Does "hold" mean something different to

5  you than it means to the rest of the population?  What is an

6  immigration hold?

7        MR. PLANT:  That's -- that's the question we're trying

8  to get at, your Honor.  Yakima County has done precisely two

9  things:  They've accepted a copy of an I-200 issued to them by

10  the Department of Homeland Security, and they have noted that in

11  their system.  They have transcribed it on a written document,

12  and they've entered it onto their website.  They've not taken

13  any other action with respect to that.  They have --

14        THE COURT:  So, a person that has an immigration hold

15  -- for purposes of Yakima County -- what you're saying is that

16  they can post bail.  They can post -- in this case, was it

17  $50,000, I believe?  Whatever the bail amount is, as soon as

18  they post that, even if they have a, quote, "immigration hold"

19  as registered under Yakima County, your position is that they

20  would be immediately released.  Is that Yakima County's

21  position?  And, if it is, I want you to give me some specific

22  examples where that has occurred.

23        MR. PLANT:  Your Honor, it's Yakima County's position

24  that, if Mr. Sanchez, or a member of his family, posts bail,

25  Yakima County will accept that bail; and they will process him

1  to be removed from custody, as they would any other inmate, with

2  the proviso that, because Yakima County has received an I-200,

3  Yakima County will notify ICE that he has posted bail and is

4  going to be released.

5       THE COURT:  But I don't understand the letter that was

6  issued.  I'm going to reference that because I want to make

7  sure.

8       MR. PLANT:  It's --

9       THE COURT:  You know which letter I'm talking about,

10 right?

11      MR. PLANT:  Yes, your Honor.

12      THE COURT:  Okay.  Explain to me what that letter

13 means in reference to what you just said because --

14      MR. PLANT:  Your Honor, this letter is to -- is to

15 sort of clarify the issues; and, if you look at -- sorry, your

16 Honor.  I'm trying to locate it here.  In this letter,

17 Director Campbell -- and I apologize.  This lawsuit was served

18 on Wednesday and Mr. Campbell was out of the state and

19 unavailable.  The letter -- as I understand this letter and as

20 it's been represented to me, is this letter is -- Mr. Campbell

21 has reached out to ICE and is providing some clarification to

22 Mr. Sanchez's attorneys.  And, particularly, the last sentence

23 explains that, you know, an ICE -- bail on an ICE hold is

24 something that's processed by the federal courts.  The Yakima

25 County Department of Corrections has asked ICE officials to

1 explain the process to Mr. Sanchez and answer any questions he

2 may have.

3      Well, certainly, Yakima County is -- does not need to ask

4 ICE how to process bail for his Yakima County charges.  I mean,

5 the purpose of this letter is to address the -- the other, you

6 know, issues that Mr. Sanchez may have.

7           THE COURT:  Then why did he say that?

8           MR. PLANT:  Which part, your Honor?

9           THE COURT:  Why did he say that he has to figure that

10 out in federal court?

11           MR. PLANT:  Because, your Honor, as I understand it,

12 the -- there is reluctance to issue bail when someone could be

13 picked up by ICE because they have a tendency to be shipped off

14 to other locations.

15           THE COURT:  Well, doesn't that go to the point that

16 the plaintiff raised pursuant to a case from the Ninth Circuit,

17 *Mendia v. Garcia*, where here we have a county making a

18 designation that there's an immigration hold that causes someone

19 not to be able to get a bail?  Isn't that what we're talking

20 about here?

21           MR. PLANT:  Your Honor, I -- so the initial question

22 had to do with the seizure; and, so, if we look at what is the

23 -- what is the conduct by Yakima County, the only conduct by

24 Yakima County relative to Mr. Sanchez has been accepting the ICE

25 warrant -- administrative warrant and documenting that.  So, I

1  mean, maybe the question boils down to:  Is the process of

2  uploading that into the jail management system where it's posted

3  on the website -- is -- is that a seizure?  And --

4        THE COURT:  So, in their mind, it's just an issue of

5  semantics that --

6        MR. PLANT:  In my mind, Yakima County has taken no

7  affirmative action to detain Mr. Sanchez in any way beyond the

8  scope of the state law criminal charges.  And I can -- I can

9  represent on the record that this allegation that, if he comes

10 in to post bail, Yakima County will simply change his status and

11 retain him in custody -- Yakima County denies that allegation.

12    Yakima County's position is that, if he comes in and posts

13 bail, we'll process him as we would process any other detainee.

14 We'll process him for discharge from custody; but, because he

15 has an administrative warrant, we will notify ICE.

16        THE COURT:  But here's my problem though:  Doesn't the

17 process that Yakima County currently has cause someone who has

18 an immigration hold not to get bail?

19        MR. PLANT:  Your Honor, that's -- it's the issuance of

20 the ICE administrative warrant that causes someone not to be

21 issued bail.

22        THE COURT:  Well, I'm sorry; but immigration officials

23 aren't posting that information onto your website.  You are.  So

24 explain to me how that's ICE fault that they're giving you an

25 administrative warrant and, then, you, the County, are posting

1  that as an immigration hold.

2         MR. PLANT:  Well, your Honor, as I stated, we are -- I

3  don't understand that it's not a publicly available document or

4  a public document.  We're processing it, and we're taking no

5  affirmative actions other than sort of documenting it in our

6  system.

7         THE COURT:  Okay.  I understand that's your position.

8  What about the argument that -- that the County is -- that this

9  re-designation -- you briefly mentioned it.  Counsel argues that

10  county officials aren't authorized -- aren't authorized to, in

11  fact, effectuate these administrative warrants; that they don't

12  have the authority, training, or otherwise to do that.

13         MR. PLANT:  So, your Honor, you're referring to the

14  claim by Mr. Sanchez that the County doesn't have the authority

15  to, if he posts bail, retain him in custody and simply switch

16  his status?

17         THE COURT:  Correct.

18         MR. PLANT:  Our position would be that's an academic

19  question.  Yakima County has no intention of doing that with

20  Mr. Sanchez.  We deny that that's our intention to do with

21  Mr. Sanchez.  We certainly agree with -- and, actually, you

22  know, they make this argument that this -- the intralocal

23  agreement that Yakima County has with the Marshals Service that

24  ICE uses doesn't contemplate that.  It contemplates that we

25  release him to an appropriate official, such as, an ICE official

1  or U.S. Marshal, and that person, then, can reenter them.  And

2  we agree that's what the -- that's what the agreement appears to

3  contemplate.

4         THE COURT:  Okay.  Can you point to anything else on

5  the record that indicates that this is not a seizure?

6         MR. PLANT:  Well, certainly, your Honor.  He's being

7  lawfully held pursuant to a probable cause determination; and,

8  if he posts bail, he will be released.

9         THE COURT:  On the criminal charge, you mean.

10        MR. PLANT:  On his state law criminal charges, yeah.

11        THE COURT:  Okay.

12        MR. PLANT:  If he posts bail, Yakima County will

13  process him for release from its custody.

14        THE COURT:  Okay.  Anything else?

15        MR. PLANT:  No, your Honor.

16        THE COURT:  All right.  Anyone from the Government

17  wanting to address this point?

18        MR. REUVENI:  Yes, your Honor.

19        THE COURT:  Okay.  Go ahead, Counsel.

20        MR. REUVENI:  Good afternoon, your Honor.

21        THE COURT:  Good afternoon.

22        MR. REUVENI:  Erez Reuveni on behalf of the United

23  States.

24        THE COURT:  I'm sorry, Counsel.  I just want to make

25  sure I have your name correct.  It's -- what's your last name?

1      MR. REUVENI:  Reuveni.

2      THE COURT:  Reuveni?  Okay.  Thank you.

3      MR. REUVENI:  Thank you.  And just at the onset, your

4   Honor, thank you for indulging us and giving us the opportunity

5   to participate at this hearing.

6      I think, from the Government's perspective, it's helpful,

7   with the Court's indulgence, just to lay out a little bit of

8   background of how this contract works from the Government side

9   of things and --

10      THE COURT:  No, Counsel.  I don't want to do that.

11      MR. REUVENI:  Okay.

12      THE COURT:  What I want you to do is answer my

13   question, which is:  Point to the record that indicates that

14   this is not a seizure.

15      MR. REUVENI:  Well, like counsel for Yakima has

16   indicated, there is no new arrest.  There is no new set of

17   restraints placed on this individual that's cognizable under the

18   Fourth Amendment.  There's no use of force.  There's nothing

19   within the normal scope of Fourth Amendment -- Fourth Amendment

20   jurisprudence is a new seizure.

21      So, if you look at all the cases that plaintiff relies on,

22   in each of those cases, *Clackamas County* in particular, there is

23   a new seizure; that the person -- in *Clackamas County*, there was

24   a policy:  We will not allow you to post bail.  Okay?  I'm

25   take -- we're taking the County at its word that there is no

1  such policy here.

2      So that's really the difference between what is a new

3  seizure and what is not.

4      In *Clackamas County,* as well, the individual was detained

5  an additional -- I believe it was 18 -- up to 18 hours when they

6  were entitled to release after, in fact, they were released on

7  their own recognizance or had, in fact, posted bond.  Again,

8  that's not the case here.  We haven't gotten there.  That's

9  entirely speculative.

10      What's likely to happen when Mr. Sanchez is allowed to post

11  bond, if he -- if he does get there, as I understand it, he'll

12  be processed by the County for release; but the County will

13  reach out to ICE, as is their practice, as they are entitled to

14  do, and as they have done for years.

15          THE COURT:  And counsel concedes that, at that point,

16  the -- the immigration officials may, in fact, serve the warrant

17  and place that person into federal custody.

18          MR. REUVENI:  That's correct.  That -- that would be

19  the new seizure and that would be a lawful seizure because it's

20  done pursuant to administrative warrant that is permitted by act

21  of Congress.

22          THE COURT:  Well, tell me this, though:  Why should

23  the Court, then, not view the designation by the County of

24  immigration hold status on an individual as, in effect, a

25  detention or a prevention from even obtaining bail, as they've

1 argued?

2      MR. REUVENI: Well, I think it's important to

3 distinguish what is an injury for Article III purposes in

4 response to your question, which is what the Ninth Circuit in

5 Judge Watford's decision was addressing, and what, in fact, is

6 on the merits of Fourth Amendment seizure.

7      So Judge Watford's decision addresses what sort of

8 allegations are sufficient to invoke Article III jurisdiction.

9 In that case, the policy that was in place -- and, again, in

10 that case, it was a U.S. citizen, not a noncitizen as is the

11 case here, who was not allowed -- or was unable to secure bond.

12 250,000 I think it was in that case. So the -- that allegation

13 is similar, but that only gets plaintiff in the door for

14 standing purposes.

15      It's instructive, I think, to go back to see what happened

16 in District Court in that case after the remand. And, in that

17 case on the merits, the issue was the qualified immunity for the

18 ICE defendants. And the judge ruled against them on that issue

19 because the individual was a U.S. citizen. So there was no

20 lawful way for ICE to issue a -- in that case, a detainer or

21 what we're referring to as an immigration hold here; but it's

22 constructively the same thing from ICE's perspective.

23      The plaintiff here is not a U.S. citizen. He's a

24 noncitizen who's been picked up on state charges of criminality

25 and is now also a removal -- subject to removal for those

1  charges.

2      So, if we were to get to the merits, which is speculative

3  because he hasn't presented -- he hasn't gone to get bond.  He

4  hasn't attempted to post bond.  He's taken the position that, if

5  he attempts to do that, it would be futile because Yakima would

6  reject it; but Yakima has told us that's not case.

7          THE COURT:  Well, hold on, then.  What do we deal --

8  how do we deal with the instruction by the County telling him he

9  has to figure that out in federal court?

10         MR. REUVENI:  Well, I think that might be an issue of

11 inartful language.  There's no bond proceeding that will occur

12 in federal court once he's picked up by ICE.  He'll be in

13 immigration court.  So what happens once -- hypothetically, if

14 he is, in fact -- if he posts bond, he's released.  But, then,

15 ICE picks him up and processes him back into Yakima as they're

16 entitled to do understand the IGA, the intergovernmental

17 contract.  Within 48 hours, he would be issued a notice to

18 appear.  It would lay out the charges against him from ICE; and,

19 then, he would be entitled to make the case for bond in

20 immigration court.

21     Just out of candor, it's unlikely ICE would view him as

22 entitled to bond under 8 U.C.C. 1226(a) given that he --

23     (Interruption by the reporter)

24         MR. REUVENI:  My apologies.

25     (Interruption by the reporter)

1    MR. REUVENI:  Well, I'm speculating; but it's possible

2 that ICE would view him as a criminal alien and he'd be subject

3 to 8 U.S.C. 1226(c).  But, even then, he would be entitled to

4 challenge that designation in what's called a "*Joseph* hearing"

5 under the regulations that would apply.

6    So his bond -- if -- if I'm understanding what the County

7 may be referring to, his bond hearing -- his custody

8 determination occurs in immigration court.

9    If he files a *habeas* case at that point, you know, that --

10 that might be in federal court, although I don't think the Court

11 would have jurisdiction.  But whatever bond -- and he's entitled

12 to this -- happens in immigration court, not in federal court.

13    So I think -- again, speculating what the County may be

14 referring to is:  Once he's in ICE custody, how does he

15 challenge that -- his custody?  And that's done through the bond

16 hearing in front of an IGA, an immigration judge, in immigration

17 court.

18    If -- if I may just address this point that plaintiffs --

19 plaintiff made as to re-designation that you discussed with both

20 plaintiff and defendant.  So, when he is processed for

21 release -- all right?  Well, let me speak more generally.  When

22 someone is processed for release from Yakima County, one of two

23 things generally happens:  ICE -- or Yakima will call ICE.  ICE

24 will come at the moment of release, and they will pick the

25 individual up and take them into ICE custody.  And, then, they

1  will take them somewhere else, most likely Tacoma, which is one

2  of the larger detention centers.  There's possibly other places.

3      Or they'll say, "Well, we can't actually drive him to

4  Tacoma tonight," or wherever they're going.  "Pursuant to our

5  IGA, we are -- we're booking him back into Yakima County,"

6  which, you know, we're entitled to do.  And now they're in ICE

7  custody, but they're physically housed at Yakima.  And, so,

8  that's done with an ICE agent doing that.

9      And there's a third scenario that could occur.  If the ICE

10  agent cannot appear in person for whatever reason -- there might

11  be some exigency elsewhere -- they will run what's called a

12  Form I-203, a request to detain book, which triggers the IGA

13  from ICE's perspective and, again, allows the person to be

14  detained in Yakima's custody, although, constructively, they're

15  under ICE detention.  It's for immigration purposes, not state

16  law charges.

17      In all three of those situations, there'd be a new seizure;

18  but it's warranted under the -- it is lawful because of the

19  administrative warrant that ICE has issued.

20          THE COURT:  The 203 procedure.  I didn't understand

21  that.  Say that again.

22          MR. REUVENI:  So it's -- an I-203 is, essentially, how

23  ICE -- think of it as a purchase order.  How does ICE get the

24  bed space in Yakima?  How do they let Yakima know we would like

25  to have this detainee housed here for this amount of time for

1  these reasons?  That's done through an I-203.  A form I-203.  I

2  believe plaintiff referenced it in their pleadings, as well.

3  It's just -- it's perfunctory.  It's just a binary -- it's the

4  paperwork.  So you fill this out.  Now Yakima knows this person

5  will be detained in Yakima on behalf of ICE.

6      But none of these things have happened yet.  So it's

7  entirely speculative which course ICE will take if it, in fact,

8  picks Mr. Sanchez up.  But, because none of those things have

9  happened yet, there's been no new seizure.

10      THE COURT:  And you don't see the fact that the County

11  is designating him as an immigration hold a problem, or you

12  don't think that that is -- that that causes someone not to be

13  able to get bail?

14      MR. REUVENI:  Well, no, I don't see it as a problem,

15  your Honor.

16      THE COURT:  Why?

17      MR. REUVENI:  A couple of reasons.  So, again,

18  speculating.  But, if I'm a bondsman, maybe the reason I'm doing

19  this is not because of the hold but because I know the guy's

20  going to end up in ICE custody and then --

21      THE COURT:  How do they know that?

22      MR. REUVENI:  Because of the hold.  That's -- the

23  County told the Court --

24      THE COURT:  Right.  But, if the bondsmen don't know

25  that?

1    MR. REUVENI:  Well, they -- they believe, if I

2  understand the Declaration from plaintiff from the one

3  individual bondsman, that he will not be allowed to post bond.

4  So that's based on an erroneous understanding of the facts here.

5    THE COURT:  So --

6    MR. REUVENI:  My question goes to a different --

7    THE COURT:  -- let me ask you it this way:  Let's say

8  that we turn back time, and Mr. Sanchez Ochoa did not have an

9  immigration hold designation.  My question is:  Don't you agree

10  that that person would be able to bond out versus the person

11  that we have now who has a designation of INS hold?

12    MR. REUVENI:  I don't -- I don't know that, your

13  Honor.  I mean, I don't know -- I can't be in the mind of -- of

14  the bail provider.  I don't know if the bail provider -- if we

15  take away these -- the facts here and we have -- there's no

16  immigration hold.  So I don't know if the bail providers then

17  would say, "Oh, he's just going to be picked up by ICE."

18    THE COURT:  Well, we know that, though, because that's

19  in the record.  Right?

20    MR. REUVENI:  Know what?  I'm sorry, your Honor.

21    THE COURT:  We know what the bondsmen do with people

22  who have immigration holds.

23    MR. REUVENI:  Well, we know what one particular

24  bondsman does based on their assumption that Yakima won't

25  release --

1      THE COURT:  Is there something else in the record that

2  you want me to look at?

3      MR. REUVENI:  We haven't submitted any facts to that.

4      THE COURT:  Okay.

5      MR. REUVENI:  So -- but that goes to whether -- in the

6  Government -- the U.S. Government's view, that goes to

7  whether -- that goes to whether -- this belief that the County

8  has a policy of not permitting release based on the hold, which

9  Yakima has told us is not the case.  And that, again, is what

10 distinguishes the facts in this case from these other cases the

11 plaintiffs -- or plaintiff is relying on.

12      On the seizure point, I just -- the Ninth Circuit has

13 already told us the answer to the question as a legal matter.

14 That's the *Kauai County* case the Government cited in its brief.

15 It's a 2002 case.  If you'd like, I can tell you precisely what

16 page.  Sorry.  Give me one minute.  Yes.  So that's that *Cruz v.*

17 *Kauai County*, 279 F.3rd 1064, pin cite 1066 and 1068, where the

18 Court there indicates that you don't have a new seizure for

19 Fourth Amendment purposes unless and until someone is released

20 from state custody only to be re-arrested and re-incarcerated on

21 some other basis.

22      And that, I would submit, is what has to happen here before

23 there is a new seizure and because that hasn't happened and

24 because we're here on a TRO posture.  So we're speculating.  Is

25 he going -- is he going to post bond now that the record has

1  been set clear by Yakima?  Is a bail bondsman going to assist

2  him now that the record has been made clear by Yakima?  Is he

3  then going to post bond knowing full well that, when he does,

4  it's very likely ICE will pick him up and rebook him back into

5  the County?  All these things are speculative.

6      And counsel for plaintiff, I think, sort of indirectly

7  makes that point.  He told you it's speculative ICE takes

8  custody.  Exactly.  It's that -- it's speculative that ICE takes

9  custody.  Unless and until it's immediate -- it's clear that

10  they are immediately going to do so, there's no immediate risk

11  of a new seizure.

12      So, really, again, he may have injury for standing

13  purposes.  That's Judge Watford's decision.  But Judge Watford

14  did not purport to reach the issue of the merits.  And, in fact,

15  there's a footnote there at the end of that decision in which

16  Judge Watford makes clear for the panel:  If he doesn't post

17  bond because he thinks he's going to be picked up by ICE, that

18  is not injury.  And that's not exactly -- that's not exactly on

19  all fours with what's happening here; but part of this from

20  ICE's view I would think is he's asking the Court to issue an

21  order taking -- removing the hold and allowing him to post bond

22  and walk.  To what -- to what end?  So that ICE has to apprehend

23  him out in the field instead of the security of Yakima County?

24  So that ICE can't re-detain him?

25      I mean, again, this is all speculative.  But why?  What --

1  what does that accomplish?  And then I think it actually cuts

2  against plaintiff in that respect.  If he's not going to post

3  bond because he knows he's going to end up in ICE custody, then

4  what are we talking about?

5      If there are no other questions on this issue, your Honor?

6          THE COURT:  I don't have any other questions on this

7  issue.

8          MR. REUVENI:  Thank you.

9          THE COURT:  Thank you.  If could I hear from the

10  plaintiffs on another point and that is on the County's

11  authority to detain -- to detain Mr. Sanchez Ochoa on the

12  administrative warrant.  Could you speak to that point?

13          MR. ADAMS:  Yes, thank you.  As I previously noted,

14  the administrative warrant is directed solely to an enumerated

15  list of federal officials.  And it's not just the form, itself,

16  that directs it to that but the regulations explicitly enumerate

17  the group of individuals who can execute an arrest warrant.

18  And, notably, state officials are absent.  It's only a select

19  group of federal immigration enforcement officers that have the

20  authority to execute that warrant.

21      And counsel for the United States, when he talked about the

22  merits of the *Mendia v. Garcia* case, that the standing was what

23  was at issue, and then they went to whether a U.S. citizen --

24  ICE had the authority to detain a U.S. citizen.

25      So here we have standing because the County impeded the

1  ability to post the bond, the bail; and, then, the issue is

2  whether the County has lawful authority to execute an arrest

3  warrant.

4      And I think -- but -- but sticking to your question,

5  there's -- there's other reasons why that -- an administrative

6  warrant is not sufficient.  It's not just because the

7  regulations and statutes limit the authority to federal

8  immigration officers.  It's also because Yakima County officials

9  have been presented with no probable cause to engage in that

10  action.  It's undisputed that this is a civil matter.  It's

11  undisputed that this is an administrative warrant with no

12  neutral magistrate or even neutral executive office adding

13  overview.

14      THE COURT:  Well, there is an immigration agent who

15  has determined that there is probable cause to believe that the

16  person has violated the laws of the United States by entering

17  this country illegally.  They've made their assertions.  How is

18  that different than, say, a detective going to a judge and

19  saying, "Judge, here is the probable cause that establishes

20  that, in fact, this person has committed this particular crime"?

21  Why is that different?

22      MR. ADAMS:  Because, in this case, the detective or

23  the ICE agent never goes to a judge, never gets any neutral

24  authority to sign off in saying, "Yes, your assertions are

25  sufficient.  You may now execute this warrant."  And that's what

1  we had in the Supreme Court's case in *Coolidge*.  You had the

2  Attorney General entering an arrest warrant that was struck down

3  by the Court precisely because the Attorney General was the

4  prosecutor in that case.

5      And you had the -- the federal court decision in *Badrawi*

6  that we referenced where, again, the federal court said that an

7  arrest pursuant to an administrative warrant must be considered

8  a -- a warrantless arrest because there is no neutral magistrate

9  that is looking over that, that's signing off on that.

10      And it's -- it's notable that in the warrant, itself, the

11  box that is checked -- it's a form sheet -- and that's -- this

12  is I-200 that's, again, in Document 7-1.  The box, itself, says

13  "Statements --" what's the basis for the finding?  "Statements

14  made voluntarily by the subject to an immigration officer and/or

15  other reliable evidence that affirmatively indicate[s] [it] ..."

16      So there's not even any specific indicia of what -- the

17  evidence they're relying on.  And, again, we do not dispute that

18  ICE officers have the authority to engage.  They've received the

19  training, the certification.  Under the regulations, they're --

20      THE COURT:  Let me stop there.  To that point, they

21  argue that they have established probable cause.  Why isn't that

22  probable cause sufficient for the state agents to then have that

23  as their basis to detain this person?

24      MR. ADAMS:  Because the state agents are not

25  authorized to enforce immigration law.  There's no basis in the

1  statute, either under Washington State law or under federal law,

2  that provides them with that authority.  And that is the

3  fundamental difference.  And, in fact, just yesterday in

4  response to a very similar case in Massachusetts --

5          THE COURT:  I read the case.

6          MR. ADAMS:  Yes.  So making a similar finding in

7  responding to the Government's arguments.

8      But the point is it -- and another point I've --

9          THE COURT:  And, Counsel, I'm sure that I don't --

10 well, I don't know that all parties know.  And, for the record

11 to be clear, if you could cite the case.

12         MR. ADAMS:  Yes.

13         THE COURT:  I believe it's --

14         MR. ADAMS:  This is the *Lunn* decision.

15         THE COURT:  Yes.

16         MR. ADAMS:  And the citation that I have for it is

17 with Lexis.  It's 2017 Mass, M A S S., Lexis 544.

18         THE COURT:  We use WESTLAW, but I have the similar

19 case.

20         MR. ADAMS:  Okay.  Thank you.

21     And I think it's also important to look at the Supreme

22 Court's decision in *Arizona* where it's reinforcing the fact that

23 this is a civil matter that the -- does not involve criminal

24 law.  And, in *Arizona*, there was even a stronger basis there,

25 because, in *Arizona*, the State had taken upon itself to enact

1  legislation that would purport to provide local law enforcement,

2  local officials, with the power to execute arrest warrants.

3  And, in that case, of course, the Supreme Court said, "No,

4  you're preempted.  You step beyond the realm that you're

5  authorized to do so."

6      But there, at least, the State of Arizona had a statute

7  that on its face purported to provide them with authority.  Here

8  you have absolutely no authority for Yakima officials to rely on

9  in order to allow them to execute that I-200 or now U.S. -- the

10  U.S. Attorney's office has told us it's the I-203 that's going

11  to magically turn our client's custody under -- from the --

12  transition it from the jurisdiction of Yakima County to the

13  Federal Defender.

14      THE COURT:  Why can't they do that?

15      MR. ADAMS:  Why cannot Yakima County make that

16  designation?

17      THE COURT:  File the 203 and have that be their

18  authority to detain or continue to detain this individual?

19      MR. ADAMS:  Because there's no basis in the law for

20  the federal government to send a local official, Yakima County,

21  a form that says, "Do this work for us."  The federal government

22  doesn't have the authority --

23      THE COURT:  The IGA doesn't cover that?  The

24  intergovernmental agreement?

25      MR. ADAMS:  Absolutely not.  The intergovernmental

1  agreement refers specifically to federal detainees.

2      THE COURT:  Counsel argued that -- as I understood

3  counsel's argument, he said that the IGA covered this.

4      MR. ADAMS:  And I'll turn to the language of -- of the

5  IGA itself, that we submitted with our reply, since the federal

6  government made reference to that.  And, so, if you go to

7  Document 28-1 and to the key section, which is on Page 5 of --

8  of that intergovernmental agreement; but it's -- Page 11 is the

9  notation of the declaration.  And, if I may read, there's three

10  short paragraphs there.  It says (reading):  The local

11  government agrees to accept federal detainees only upon

12  presentation by a law enforcement office -- officer of the

13  federal government with proper agency credentials.

14      So all of a sudden the federal government has skipped over

15  this very important step where they actually took custody of our

16  client or of an individual and then presented them to the local

17  authority.

18      And then it goes on to say (reading):  The local government

19  shall not relocate a federal detainee from one facility under

20  its control to another.

21      So, again, we're talking about federal detainees after that

22  point.

23      This -- this provision, this contract, provides no

24  authority for Yakima officials to execute the arrest warrant, to

25  engage in enforcement activities.

1    THE COURT:  Is there no Washington State law that

2  authorizes them to do that?

3    MR. ADAMS:  There is no Washington State law that

4  authorizes.  The only opportunity to engage in this civil

5  enforcement of immigration law is if a local municipality or

6  county went through the training certification process at

7  8 U.S.C. 1357(g) where they go through a certification, a

8  training, and then they renew that training, they have

9  supervision.

10    But it's notable that no municipality or county in

11  Washington State has participated in that program.  There's no

12  authority under federal law or state law to engage in this

13  conduct.

14    And, while the attorney for Yakima County calls this an

15  academic question, I think it was -- it was very enlightening to

16  hear the attorney for the U.S. Attorney's office saying, "Well,

17  it's not that they're always going to be released.  Sometimes

18  we'll just send them this form and that it's perfunctory and

19  procedural."  And -- and that is precisely what we're

20  challenging.  It's one of the -- the harms that we are

21  challenging here.

22    THE COURT:  Okay.  Thank you.

23    MR. ADAMS:  Thank you.

24    THE COURT:  Mr. Plant?

25    MR. PLANT:  Your Honor?

1       THE COURT:  Go ahead.  Same question.

2       MR. PLANT:  Could you repeat the question, your Honor?

3       THE COURT:  Yes.  Talk to me about the administrative

4  warrant and whether or not the County would be authorized to

5  enforce that -- serve that warrant or enforce that warrant.

6       MR. PLANT:  Well, your Honor, our -- our position

7  would be that much of the case law cited by all of the parties

8  arises in the context of the I-204 detainers.  And there appears

9  to be a lot of litigation going on around the country right now

10  on the scope and effect of administrative warrants.

11     Yakima County acknowledges that the warrant is a civil --

12  civil warrant.  It's issued to other immigration officers and

13  authorizes other immigration officers to detain individuals to

14  whom an administrative warrant is -- is directed.

15      THE COURT:  And you agree that county officials --

16  county representatives could not enforce that.  Is that fair to

17  say?

18      MR. PLANT:  That's correct.  Yakima County

19  acknowledges that it -- it has no authority to arrest anyone on

20  the basis of an administrative warrant.  I think the case law

21  is -- is -- is sort of well established that we can cooperate

22  with, you know, other agencies.  But, yeah, we don't dispute

23  that we don't have the authority to arrest or -- or detain

24  anyone on the basis of an administrative warrant.

25      THE COURT:  Okay.

1    (Pause in the proceedings)

2        MR. REUVENI:  Your Honor?

3        THE COURT:  Yes, please approach.

4        MR. REUVENI:  Thank you again, your Honor.  Same

5    question?

6        THE COURT:  Same question.

7        MR. REUVENI:  All right.  So, to start, this question,

8    I think, more so than what we discussed on the last set of

9    questions, is, in fact, more academic because it is not live

10   right now.  The warrant hasn't -- the County hasn't made an

11   arrest based on the warrant.  No one has made an arrest based

12   on --

13       THE COURT:  No, Counsel, hold on.  I want you to

14   follow my thinking here.  Let's assume for a second that I

15   believe that, in fact, this is a detention.  Then the only way

16   that the County could continue to detain this person is if, in

17   fact, they were authorized in some way to, you know, enforce

18   this particular warrant, to serve this warrant, and to enforce

19   the administrative warrant.

20       MR. REUVENI:  Sure.

21       THE COURT:  If that were the case, that's the only

22   avenue that that would occur.  Correct?

23       MR. REUVENI:  So I want to be clear on ICE's position

24   on this.

25       THE COURT:  Okay.

1    MR. REUVENI:  That's not what's happening here, and I

2  understand that *Lunn* -- I'm familiar with the case.  I signed

3  that brief.  I understand that that's a new and interesting way

4  to go here, but that's not teed up in this case.  No one is

5  alleging that a -- that, once a new seizure occurs by the

6  County, that the County is now making an arrest that it's

7  unauthorized to do under state law.  That's not a claim in the

8  Complaint.  That's not an argument in the TRO.  That's nowhere

9  in the papers.  So that -- that's an interesting question for

10  another hearing or lawsuit.

11    THE COURT:  Counsel -- but the unfortunate thing for

12  you is that I'm the judge asking that question.

13    MR. REUVENI:  That is definite.

14    THE COURT:  So please answer that question.

15    MR. REUVENI:  So we've laid out, over the course of 20

16  pages in our brief -- and I'll just summarize here rather than

17  belabor the point.

18    So the administrative warrant does establish probable cause

19  for a federal officer to make an arrest, and the administrative

20  warrant also establishes probable cause an individual is

21  removable from the United States.  I don't think anyone thus far

22  disagrees with those two premises that I've laid out from either

23  side.

24    I think it's helpful here to look at *Arizona*.  Let's start

25  there because that's where plaintiffs referred the Court to.

1   And there plaintiffs also referred to the only way a county,

2   under *Arizona,* in their view could make an arrest based on a

3   warrant, assuming, in fact, that's what's happening in this

4   case --

5           THE COURT:  Okay.

6           MR. REUVENI:  -- if there was an agreement to do so; a

7   so-called 287(g) agreement under 8 U.S.C. 1357, 1 through 9.  So

8   that's not what *Arizona* says.  *Arizona* says that's one way it

9   can happen.

10      There's a second way *Arizona* says it can happen, and here I

11  think it maybe helpful to -- I'll just quote to the Court

12  directly from the case.

13          THE COURT:  Okay.

14          MR. REUVENI:  That's 567 U.S. at 410.  So the issue in

15  *Arizona* really was that, in Arizona law, quote -- oh, I'll not

16  quote -- allowed Arizona officers to arrest, quote, "without any

17  input from the federal government about whether the arrest is

18  warranted in a particular case."  So that's one point of

19  observation from *Arizona*.  That's not what's happening here.

20  The Government has provided Yakima the input.  It's given the

21  administrative warrant and said, "Hey, let us know when you

22  release this guy."  So that's not what was happening in the

23  *Arizona* case.

24      Separately, as to the issue of cooperation, the Court was

25  clear to distinguish unilateral action from the following:

1 Quote, "a request, approval, or other instruction from the

2 federal government."  And, in fact, it listed as forms of

3 permissible cooperation two things that are relevant here:  One,

4 to allow federal immigration officials -- I'm quoting -- "to

5 gain access to detainees held in state facilities" and, two, to

6 share information -- here I'm referring to 8 U.S.C. 1357(d).

7 That's the detainer statute; and this is at 567 U.S., again, at

8 410 -- to respond to requests for information about when an

9 alien will be released from their custody.  These are the two

10 things that are happening in this case.

11        So, even if we assume for purposes of your question, your

12 Honor, the issue of whether the arrest has actually occurred

13 pursuant to a warrant, whether the administrative warrant here

14 is, in fact, a new seizure, it would be permissible under

15 *Arizona*.

16        The next case I think that's helpful to answer your

17 question is *Santos*, a Fourth Circuit decision that really delves

18 into these issues.

19             THE COURT:  And, so, wait.  Let me back up here.

20             MR. REUVENI:  Sure.

21             THE COURT:  Because you just said that under

22 *Arizona* -- under -- that that's authority for -- as I understood

23 your argument -- for the County to, in fact, enforce this

24 warrant?  Is that what you're saying?

25             MR. REUVENI:  No.  *Arizona* is saying the county

1  enforcing the warrant is not preempted under federal law.  And,

2  so, for purposes of federal law, if the County takes this action

3  in response to and only in response to a request, direction,

4  instruction, or some similar act of reaching out by the U.S.

5  Government, that's not preempted.

6           THE COURT:  Okay.  Let me stop you here.  And, in this

7  case, that has not happened.

8           MR. REUVENI:  A request from the U.S. Government?

9           THE COURT:  Yes.

10          MR. REUVENI:  Absolutely it's happened.  This is

11 what -- how the U.S. Government interacts with Yakima under

12 Yakima's policy, and let me unpack that.  Yakima, after

13 *Clackamas County*, decided they won't respond to detainer

14 requests.

15          THE COURT:  Right.

16          MR. REUVENI:  Specifically not -- so there's two

17 aspects to a detainer request:  Letting the Government know an

18 individual's release date, which they still do and which *Arizona*

19 makes clear they can for purposes of federal law, and, then,

20 holding someone for up to 48 hours for ICE to come pick them up.

21 So that's the second part of a detainer.  That's the part

22 *Clackamas County* addressed under a different policy involving a

23 different set of facts.

24     But that's what the County here in Yakima is not doing any

25 more.  No one here has alleged that will happen if and when they

1   release him or after he posts bond.  As I've said, ICE will come

2   most likely and pick him up right then and there and take him to

3   a new location or they'll rebook him back into Yakima County.

4   That would be the new seizure; and ICE would be doing that, not

5   the County.

6          In terms of --

7          THE COURT:  I guess I don't understand what you're

8   saying; that there's this request.  I thought that the warrant

9   -- and I read that.  I thought it directs agents -- state agents

10  -- not state agents but rather immigration officers, not state

11  agents.  So where in that -- in that warrant, administrative

12  warrant, do you see that there being authority for state agents

13  to enforce that?

14         MR. REUVENI:  So why else would ICE serve the warrant

15  both on the County so then the County can populate its database

16  and on the individual in this case?  That's them reaching out to

17  the County and saying, "Hey, we are requesting that, when you're

18  done with this individual, when he's released from state

19  custody, let us know."

20         THE COURT:  Well, they can give them whatever they

21  want; but --

22         MR. REUVENI:  That's what will happen here.

23         THE COURT:  Hold on.  They can give them whatever they

24  want, but my question is different.  What in that do you believe

25  establishes that they are directing them to enforce this

1  warrant?

2      MR. REUVENI:  That's not what's happening from the

3  Government's view.  The Government is not directing anyone to

4  take any action.  We are requesting.  If we were to direct them

5  to take action, that would be a Tenth Amendment problem.  And,

6  so, we are not telling the County to do anything.  We're not

7  telling the County to take any action that is mandatory in the

8  Government's view.  We are making the request.

9      If they -- if there is a new seizure -- so, again, to your

10  hypothetical, your Honor.  If there's a new seizure, the

11  administrative warrant that's now in the record and in the file,

12  relying on it, what the County has done here is, in your view, a

13  new seizure.  The probable cause in that administrative warrant

14  is all that is required.

15      And, so, again, I think if I may take it to the next step

16  here, I was going to refer to *Santos*.  So what does *Santos* say?

17  *Santos* is a Fourth Amendment -- or Fourth Circuit decision

18  applying *Arizona* in the Fourth Amendment context.  And here I'm

19  quoting again, 725 F.3d at 466.  *Arizona*, the United States

20  makes clear that under Section 1357(g)(10), "local law

21  enforcement officers cannot arrest aliens for similar

22  immigration violation absent at a minimum direction or

23  authorization by federal officials."  "Direction or

24  authorization by federal officials."  That's what the warrant

25  is.

1    So the Fourth Circuit has said in this circumstance, if

2   there were to be a new seizure -- and what the County has done

3   here, put the immigration hold in place -- or even forget that.

4   Let just say there's a new arrest.  The County has made --

5   hypothetically made an arrest based on this warrant at the

6   Government's request -- U.S. Government's request.  *Santos* tells

7   us that's not a Fourth Amendment violation.  *Santos* tells us,

8   because the Government has requested it, that is not a problem.

9    It'd be different, concededly, if the County were to

10  unilaterally go out, effectuate an arrest based on a warrant

11  where ICE has not reached out to them, which is, in fact, what

12  happened in *Santos*.  There was a warrant on what's called the

13  "NCIC database."  They relied on it and picked him up.  Then

14  they called ICE.  ICE hadn't asked them to do that.

15    But that's not the situation here.  ICE affirmatively goes

16  to the jail, interviewed this individual, lodged the warrant

17  after learning -- after this individual admitted he was in the

18  United States unlawfully in ICE's view, then lodged that warrant

19  with the County and served it on this individual.

20    And, again, in the Government's view, there has been no new

21  seizure.  Unless and until he's released and picked up by ICE,

22  there's no new seizure.  But, to your hypothetical, if there is

23  to be a seizure and it's done by the County, *Arizona* plus *Santos*

24  provide the authority in the Government's view that that is an

25  acceptable approach by the County.  The probable cause in the

1  warrant does not violate the Fourth Amendment.

2  And, so, this gets to some points we've raised in our

3  brief.

4  THE COURT:  We're not there yet.

5  MR. REUVENI:  Very well.

6  THE COURT:  All right.  Thank you.

7  MR. REUVENI:  Okay.  There's one other point I wanted

8  to make on this issue if --

9  THE COURT:  Go ahead.

10  MR. REUVENI:  It's the -- this ties into something you

11  asked about before on the bail bondsmen.  So, if the bail

12  bondsman were to go to the county jail and inquire about, "Well,

13  should I give this guy a bond?  Should I pony up the money," he

14  will learn that the admin warrant has been issued.  ICE has done

15  that, not the County.

16  THE COURT:  How -- how do you know that?

17  MR. REUVENI:  Well, it's in the system.  He looks in

18  the system.  He sees he's got the admin warrant.

19  THE COURT:  Well, we talk about "the system."  What

20  does it mean for him to have access to the system?

21  MR. REUVENI:  He's relying on the information in the

22  system in making his determination not to post bond in this

23  instance.  So he -- what's causing all that is the administrate

24  warrant.  Now, the County has a policy of noting the

25  administrative warrant in the system; and that's how the bail

1  bondsman acquires that information, because it's publicly

2  available information.  So they go on the website.  They see it.

3  They learn that.

4       But to the extent that the question is:  Does the County do

5  this?  Does ICE do this?  Who causes that?  At the end of the

6  day, the warrant does it; and it's perfectly acceptable for the

7  warrant to do it because the warrant has the probable cause

8  finding.  And when and if the alien's released, ICE is fully

9  entitled to pick him up based on the warrant.  If the bondsman

10  doesn't want to take that chance is an issue for the bondsman.

11       Thank you.

12           THE COURT:  All right.  Thank you.

13       The question, I guess, for all counsel.  The Court

14  understands that Mr. Sanchez Ochoa is raising constitutional

15  claims, you know, under the Fourth Amendment.  However, can the

16  Court decide this case on statutory or other grounds?  So I'll

17  ask the plaintiffs first.

18           MR. ADAMS:  Thank you.  1983, which he -- which he's

19  brought his claim under, allows him to assert redress for

20  violations of either the U.S. Constitution or federal statute;

21  and there is no federal statute that authorizes Yakima to engage

22  in enforcement activities.  And, so, to the extent that their

23  actions violate the statute, which would be, again, 1357(d),

24  which is the provision that discusses detainers and that -- and

25  that provision only talks about sharing information and, then,

1  the implementing regulations bring in the holds.  But even with

2  the holds, again, to the extent it violates that statute, then

3  there is that claim.

4       We believe the constitutional claim is -- is more clear

5  because the implementing regulations for 1357(d) go far beyond

6  the statute itself.  In -- an example of that, again, would be

7  in the -- the *Arizona* case in the Supreme Court where the --

8  there was much discussion in the briefing about the extent of

9  the detainer regulations.  But the Supreme Court cited only to

10 the statute and discussed only the information-sharing

11 component, which is what the statute consists of.

12      So I -- I think as -- for purposes of the 1983 claim, while

13 it's possible, it's a -- it's a much more clear route to go

14 through the Fourth Amendment.

15           THE COURT:  Okay.  Mr. Plant.

16           MR. PLANT:  Your Honor, Yakima County's position would

17 be there's one allegation in the Complaint, the Fourth Amendment

18 violation; and that would be the proper basis for adjudicating

19 the temporary restraining order.

20           THE COURT:  Okay.  Thank you.

21           MR. PLANT:  Thank you.

22           THE COURT:  Counsel?

23           MR. REUVENI:  Thank you, your Honor.  I would agree

24 mostly with the counsel for Yakima.  These claims have not -- a

25 claim -- a statutory claim has not been plead.  A regulatory

1 claim has not been plead.  The -- the issue that -- what

2 8 U.S.C. 1357(d) or the regulations implementing it mean or do

3 not mean, whether they're lawful or not lawful, whether they

4 exceed authority or not, none of that's plead.  None of that's a

5 claim here.

6     The only claim that has been plead is there's been an

7 unlawful new seizure; and, so, in the Government's view, the way

8 to resolve this case is to find there has been no seizure.  And

9 when and if there is a new seizure, the Court can deal with that

10 issue at that time.

11     THE COURT:  Okay.  Counsel, I don't need additional

12 argument on any other points.  However, I want to give you this

13 opportunity to address any final points that you think are

14 relevant for the analysis and for the motion before the Court.

15 I'll start with the plaintiffs.

16     MR. ADAMS:  Thank you.  Not to indulge too much but we

17 believe that -- that the charges that have been made make clear

18 that -- that the County has engaged in conduct that has deterred

19 our or impaired our client's ability to interact with the bail

20 bond agency.  Now, I'd just make the point that it's not just

21 the bail bond's affidavit.  It was also the sister's affidavit.

22 It was also a licensed attorney in Yakima who practices both in

23 federal and --

24     THE COURT:  I know Ms. Stevens and her reputation.

25     MR. ADAMS:  So we have multiple sources that say, yes,

1  this is an impact; and now we have the U.S. Attorney's office

2  also acknowledging that, yes, there's another form that they

3  submit.  That -- where they don't show up, this I-203, that

4  they'll just perform this administrative transition; and that's

5  precisely the practice that we've experienced, that our clients

6  have experienced, and -- and have informed our client in -- in

7  advising that he has no opportunity for release.

8           THE COURT:  Okay.  Thank you.

9           MR. ADAMS:  Thank you.

10          THE COURT:  Mr. Plant?

11          MR. PLANT:  Your Honor, I'd like to make just a final

12 point on an issue I thought, you know, was of -- of note, which

13 had to do with the posting of the I-200 onto the County's

14 website.

15          THE COURT:  Right.

16          MR. PLANT:  And that gets to sort of the relief that's

17 sought by the -- Mr. Sanchez in this lawsuit.  He seeks the

18 County to sort of remove its immigration hold.  And, you know,

19 as we discussed, what the County's done is received an

20 administrative warrant from ICE; and it's sort of noted it in

21 its -- in its system.  One way it's noted it -- noted the

22 administrative warrant in its system is by entering it into its

23 jail management system, which then populates the website.

24      And that's the County's action here.  The -- I do a lot of

25 public records litigation; and whether or not the County posts

1  that to its website, that's a public record.  Any bail bondsman,

2  any person in the State of Washington or in the United States

3  could make a public records request to Yakima County.  Do you

4  have any administrative warrants for Mr. Sanchez?  And we would

5  have to produce those.

6      Is the relief that Yakima County no longer accepts

7  administrative warrants?  Is the relief that we handle them in a

8  certain way?  And with respect to Mr. Sanchez, we already have

9  an administrative warrant for Mr. Sanchez.  I mean, the ship has

10  sort of sailed.  I just want to make that sort of point.  I

11  think the relief is -- I'm just not sure, you know, what -- what

12  are they asking for in this case?

13      THE COURT:  Actually, I'm glad you're raising that

14  point; and let me -- let me go back to the plaintiffs here for a

15  second.  I notice that in the letter that you -- that counsel

16  sent to -- and, of course, I can't find it at this time.  But

17  remember there was a specific request for two things.  Here it

18  is.  So, the letter that was sent to Ed Campbell -- that's in

19  Document 7-3?

20      MR. ADAMS:  Yes.

21      THE COURT:  It requested two things:  One, the removal

22  of ICE hold placement on Mr. Sanchez and, two, clearly stating

23  that Yakima County will no longer accept I-200 forms or

24  administrative warrants as authorized for placing ICE holds on

25  persons -- so referring to, obviously, more than just

1  Mr. Sanchez.

2       What is the relief that is being sought today?

3       MR. ADAMS:  The relief today is directed specifically

4  to Mr. Sanchez.  It is that the ICE hold or the immigration hold

5  or the designation, however that's labeled, be removed and that

6  Mr. Sanchez be permitted the opportunity to post bail and be

7  physically released from Yakima County.

8       Now, if -- again, if ICE officers wished to show up and

9  detain him at that point, that -- that is the prerogative of the

10 Federal Government but that -- specifying that Yakima County

11 cannot, as an administrative matter, redesignate him into ICE

12 custody.

13      THE COURT:  Mr. Plant has said, well, that ship has

14 sailed.  They already have an administrative warrant that

15 already -- they already have that information.  It's already in

16 their system, if you will.

17      MR. ADAMS:  We -- we have a Declaration from a bail

18 bonds agency saying that if that immigration hold were removed,

19 they'd be willing to cooperate with our client to -- and engage

20 in services with our client.  And, so, that's the first part.

21      And the second part is:  We don't know what's going to

22 happen with the -- if he's able to post bail, are they going to

23 administratively redesignate him under federal custody?  Or are

24 they going to comply with the practice that they've asserted

25 today and say he'll be physically released?  And, at that point,

1    it's up to DHS to do what they -- what they will.

2          THE COURT:  I presume they will call immigration and

3    inform them of his pending release.

4          MR. ADAMS:  Yes.  And we -- we do not oppose that.  We

5    certainly recognize their authority to do that.

6          THE COURT:  All right.  Thank you.  Counsel, any final

7    point?

8          MR. REUVENI:  Thank you, your Honor.  Very quickly.

9    Just a few final points.  Thank you, your Honor.

10          THE COURT:  Okay.

11          MR. REUVENI:  So, in our view, again, there has been

12   no new seizure.  So, largely, the -- the back and forth, the

13   questioning on what's the authority for the County to effectuate

14   an administrative warrant in the abstract outside the

15   circumstances presented here, that's not this case.  At least

16   not yet.  There's no allegations to that.  There's no claims to

17   that.  So we think that, at least particularly in the context of

18   a TRO, it would not be the appropriate time to reach that issue;

19   and there's no need to.  There's been no new seizure.  When and

20   if he posts bail, one of three things will happen, as I

21   mentioned, on that point.

22          So I -- I told the Court three things may happen, and that

23   was in chronological order of what's most likely to happen.

24   What's most likely is ICE will pick him up and take him to

25   Tacoma.

1    Second, they'll pick him up and book him back into Yakima.

2    What I mentioned with the I-203, which is not at issue in

3    this case that we know of at this time because no one's alleged

4    it and it hasn't happened yet.  That's a distant third if they

5    can't do one of the first two things, but that does happen in

6    Yakima from time to time.  Just duty of candor to the Court.

7    Again, even if there's a new seizure, we fully believe

8    under *Arizona*, *Santos*, the authorities we cited in our brief,

9    particularly Paged 29 to 47, there's probable cause to make the

10   arrest.  If it's lawful under the Fourth Amendment for the U.S.

11   Government to effectuate an arrest based on an administrative

12   warrant, it cannot be unlawful under state law.  That's *Virginia*

13   *v. Moore*, which we cited in our brief.

14   Also a second case that's very helpful that plaintiffs

15   didn't -- plaintiff did not mention when they mentioned

16   *New Hampshire v. Coolidge* is *Abel v the United States*, a 1960

17   Supreme Court case.  In five pages, it explained that

18   administrative warrants, as the basis for immigration

19   enforcement, has, quote, the sanction of time; and it's been

20   lawful and on the books in the United States since roughly 1789.

21   So the Supreme Court has made clear this is okay with respect to

22   the use of administrative warrants.

23   On the issue of the letter and the inexactitude of what is

24   federal court, I mean, immigration court is a federal court with

25   respect -- from the perspective of the State and the perspective

1  of the County.  So, in that letter, if the Chief is saying, "You

2  can deal with that in federal court," well, yeah.  He's -- we

3  think he's referring to immigration court, but he's not an

4  immigration lawyer.  He's not a civil litigator.  He's a police

5  -- he's a law enforcement officer.  So, he's speaking with

6  inexactitude.  I don't think it really pushes plaintiffs across

7  the line from no likelihood of success on the merits to

8  likelihood of success in the merits in this posture.

9       And, as to relief, again, I mean, this -- he wants -- I'm

10 not -- I'm not understanding it; but what I'm under -- what I

11 hear plaintiff's counsel saying is they want the hold lifted so

12 that he can walk out of jail and then be arrested by ICE.  I

13 don't think they want that.  They're telling you they want that,

14 but they don't want that.  That's most likely what will happen.

15 So it's not really any sort of relief.  He'll be picked up by

16 ICE.  Then the new seizure that we're all talking about here

17 will occur, and no one disagrees that that seizure will be

18 lawful because it's pursuant to an administrative warrant under

19 8 U.S.C. 1226(a).

20      Thank you.

21           THE COURT:  Thank you.  I'm going take a five-minute

22 recess.

23      (Court recessed at 3:47 p.m.)

24      (Court reconvened at 3:56 p.m.)

25           THE COURT:  As I indicated when we started this

1   hearing, I noted that what the plaintiff is asking is that the

2   Court take this extraordinary step and remedy to issue this

3   temporary restraining order prohibiting Yakima County to engage

4   in the process that they have been; that is, to issue what they

5   have termed as an "immigration notice" -- and put that in

6   quotation marks -- but really is, in their mind, a notice and to

7   prohibit them from engaging in that conduct.

8       The County indicates that, when they indicate in their

9   records that this is an immigration hold, it is -- they argue it

10  is not an immigration hold.

11      You know, one of the things I do when I talk to jurors and

12  they come in for a trial, I tell them -- I said -- I say to

13  them, I say, "Jurors, when you walk into this courtroom and you

14  cross that threshold, that doesn't mean that you have to suspend

15  your common sense and suspend your experience and forget that."

16  And I think that applies here.

17      How else are you going to interpret an immigration hold but

18  for the fact that it is, in fact, an immigration hold?  It is a

19  detention that Yakima County is engaging in.

20      Now, there are several rationales that indicate that this

21  is, in fact, so.  One way, as argued by the plaintiffs, is that

22  it prevents individuals like Mr. Sanchez Ochoa from obtaining a

23  bond.  So it, in effect, is a seizure.  It prevents an

24  individual from obtaining a bond, period.  And I can tell you,

25  in all of the years that I practiced in state court, it had that

1  effect.

2      Now, that's not just my experience because, again, I'm not

3  intending to suspend that; but that's bolstered by the record

4  that's been presented to this Court:  The Declarations that have

5  been filed both by the bails bondman, the attorney who has a --

6  who is an experienced attorney I know very well and, in fact, is

7  experienced both in criminal and immigration law.  And, so, I

8  just -- I don't know how to see that designation by the County

9  as anything other than a detention.

10     And, so, the other issue, then, is:  Despite that

11 detention, if, in fact, we have a detention, is -- is there

12 something that authorizes the County to enforce that

13 administrative warrant?  By the County's own admission, there is

14 not; and I would agree with that.  The immigration warrant is

15 directed to immigration officials or other individuals that are

16 not relevant to today's discussion.

17     The Government argues that what I should do is just accept

18 the fact that an immigration official has indicated that

19 probable cause has been established and that that should serve

20 as a basis for the County to enforce that administrative

21 warrant.  I'm not prepared to do that or to accept that argument

22 because, frankly, that goes to the heart of the Fourth

23 Amendment.  Probable cause has to be established by a neutral

24 and detached magistrate, period; not by the executive branch,

25 which is what's happening here.

1    The County is not authorized under that warrant to detain

2  Mr. Sanchez Ochoa.  And when one looks at the Ninth Circuit

3  interpretation here, when the plaintiff demonstrates a serious

4  question going to the merits that were raised and the balance of

5  hardship tips sharply in the plaintiff's favor, the Court should

6  grant the motion.

7    In evaluating the four factors -- four *Winter* factors:  The

8  likelihood of success, the fact that Mr. Sanchez Ochoa is likely

9  to suffer irreparable harm when balancing the equities, and

10  whether this is in the public interest -- the Court concludes

11  that all of those factors are met.

12    As such, the Court will, in fact, issue the temporary

13  restraining order specific to Mr. Sanchez Ochoa.

14    The Court will supplement its oral ruling with a very

15  detailed analysis and order outlining its thinking, but I wanted

16  the parties to have the benefit of the ruling at this time to

17  plan accordingly.

18    Counsel, is there anything else we need to address today?

19  First, over here with the plaintiffs.

20    MR. ADAMS:  If I may, does the -- so -- the question

21  is the timing for our client.  I assume that the holds will be

22  lifted so he'll be able to post -- engage with the bail bonds

23  agency immediately?

24    THE COURT:  That's the intent of the Court.  Let's

25  hear from Mr. Plant.  Is that going to be a problem?

1    MR. PLANT:  Well, your Honor, I certainly do require a

2  little bit of clarification.  As stated in our Declarations,

3  it's our position that he has been able to post bond at any time

4  before today and after today's ruling.  I understand your ruling

5  to be that the detention is the act of posting the

6  administrative warrant to the County's website?  I just want to

7  get clarification on that.

8    THE COURT:  No.  The -- the specific procedure that

9  the County has of designating immigration holds on individuals

10  it receives administrative immigration warrants, that is what is

11  being restrained specifically to Mr. Sanchez Ochoa, of course.

12  But that immigration hold must be lifted.  And if that means

13  that you have to remove that designation from your website, then

14  that's what that means.

15    MR. PLANT:  Just a point of clarification.  So Yakima

16  County will presumably continue to receive administrative

17  warrants, and I'm just thinking about -- let's -- for example,

18  we remove the immigration hold notation from the website.  We

19  get calls from bail bondsmen having received an administrative

20  warrant for Mr. Ochoa.  I'm just uncertain as to -- I guess

21  maybe I would ask that, I guess, if there's a written ruling to

22  provide some clarity to handle those --

23    THE COURT:  And I will do that.  I'll hear from

24  Mr. Adams.  If you could specify the relief sought, that way we

25  can go forward.  At the podium.

1        MR. ADAMS:  With respect to the temporary restraining

2   order that we've requested, we are seeking an order that enjoins

3   Yakima County from placing an immigration hold, which would

4   include listing that on the website or providing information to

5   any other individual that they've designated some immigration

6   restraint in their -- in their system.

7        Now, they've discussed -- or speculate about persons doing

8   public records requests, which seems very hypothetical given the

9   nature of bail bonds agency and -- and the speed of things.  We

10  don't -- I -- I -- I just think that's speculation at best.

11       And what -- what is available are the public -- on their --

12  on their website, and they shouldn't be seeking to undermine

13  that order by providing information over the phone that people

14  would not otherwise be entitled to.

15       And, then, the second point of clarity that we seek is that

16  Yakima County may not redesignate him as being under the custody

17  of the Department of Homeland Security without the Department of

18  Homeland Security actually taking physical custody of him and

19  then re-submitting him to the county jail pursuant to their

20  agreement.

21       THE COURT:  Okay.

22       MR. ADAMS:  Thank you.

23       THE COURT:  And, you know, one of the things that I

24  will do, I want to go back to the plaintiff's motion.  This is

25  not an opportunity to expand also what they have requested

1  initially.  That's not fair to the County.

2      So I'm going to review the specific requests that they have

3  indicated.  But I can say this:  That the County should not

4  engage and is, in fact, enjoined from acting in any way that

5  causes Mr. Sanchez Ochoa from -- preventing him from, in fact,

6  posting bail by information they release about his immigration

7  status.  If you are releasing information about his immigration

8  status to bail bondsmen, it's -- we're doing an end-around to

9  what the Court is ruling today.  But I can be more specific in

10 the order that I issue.

11          MR. REUVENI:  Your Honor, may I ask you a question

12 about that point you just raised, if I might --

13          THE COURT:  Sure.

14          MR. REUVENI:  -- from the Government's perspective?

15      Your Honor, are you familiar with 8 U.S.C. 1373, which I

16 believe is cited in our papers?

17          THE COURT:  Why don't you inform me.

18          MR. REUVENI:  That's the statute -- federal statute

19 that indicates that there can be no law or policy, state or

20 local, that prevents any individual on the local level from

21 sharing immigration status information with another law

22 enforcement agency or the public or the Federal Government.

23          THE COURT:  Okay.

24          MR. REUVENI:  So, perhaps, from our perspective, we'd

25 appreciate hearing some -- in the order, we hope to see some

1   clarification on how your order is consistent with that statute.

2       I'd also ask -- just to understand when I go back to talk

3   to my clients.  So your order is not directed at the practice of

4   ICE submitting administrative warrants to the County, from what

5   I understand.

6           THE COURT:  That's not before the Court.

7           MR. REUVENI:  Right.  So you're just directing the

8   County not to place an immigration hold in their system and

9   taking no further action inconsistent with your desire that

10  Mr. Sanchez be -- if the bail bondsman will provide him bond,

11  notwithstanding the existence of the administrative order, be

12  allowed to post that bond.

13          THE COURT:  Well, that's -- that's what was requested

14  by the plaintiffs.

15          MR. REUVENI:  Okay.  Thank you, your Honor.

16          THE COURT:  I have a feeling -- and this is simply an

17  intuition -- that this is not the last I've heard of this issue

18  in this District or in this case.  That's just an intuition.

19          MR. PLANT:  Your Honor, could I just follow up with --

20          THE COURT:  Sure.

21          MR. PLANT:  Your Honor, I just wanted to sort of

22  clarify this -- the last comment you made on acting in any way

23  that causes Mr. Ochoa or preventing him from posting bail.  That

24  includes sharing information?  So, obviously, under Washington

25  law, any record received by the County is a public record.  So,

1  if -- if the County is going to be enjoined from producing

2  administrative warrants that it receives in response to public

3  records request, I just request that that be stated very

4  explicitly in an order.

5          THE COURT:  It will be.

6          MR. PLANT:  Thank you, your Honor.

7          THE COURT:  And, to be clear, the Court is not

8  intending to prevent the County from meeting its obligations

9  under state law, including public records requests.

10          MR. PLANT:  Thank you, your Honor.

11          THE COURT:  Okay.  Anything else?

12          MR. ADAMS:  No.  Thank you very much.

13          THE COURT:  Anything else?

14          MR. PLANT:  No, sir.

15          MR. REUVENI:  No, your Honor.  Thank you.

16          THE COURT:  Then I'll thank you for your presentations

17  and your filings in this matter.  Thank you.

18      (Court adjourned at 4:13 p.m.)

19

20

21

22

23

24

25

1                          **GENERAL INDEX**

2                                                                **PAGE**

3    Motion for Temporary Restraining Order:

4        By Mr. Adams........................................  4
         Response by Mr. Plant..............................  12
5        Response by Mr. Reuveni............................  18
         Reply by Mr. Adams.................................  29
6        Further Response by Mr. Plant......................  36
         Further Response by Mr. Reuveni....................  37
7        Mr. Adams addresses the Court's questions..........  46
         Mr. Plant Addresses the Court's Questions..........  47
8        Mr. Reuveni Addresses the Court's Questions........  47
         Final Summation by Mr. Adams.......................  48
9        Final Summation by Mr. Plant.......................  49
         Mr. Adams Re: Relief Being Sought..................  51
10       Final Summary by Mr. Reuveni.......................  52

11   Court's Oral Decision...............................  54

12   Follow-up Questions From Counsel....................  57

13   Reporter's Certificate..............................  64

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, RONELLE F. CORBEY, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

DATED this 1st day of August, 2017.

_____
RONELLE F. CORBEY, RPR, CSR, CRR
Official Court Reporter for the
U.S. District Court for the
Eastern District of Washington in
Spokane County, Washington